## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HOLLY SEGNERE<br>1856 C. Farmington Ave.<br>Pottstown, PA 19464, | :<br>:<br>: Civil Action No.<br>: |
| Plaintiff, | :<br>: Jury Trial Demanded |
| v. | :<br>: |
| PARKHOUSE NURSING AND<br>REHABILITATION CENTER, L.P.<br>1600 Black Rock Road<br>Royersford, PA 19468, | :<br>:<br>:<br>: |
| PARKHOUSE OPERATING, LLC<br>1600 Black Rock Road<br>Royersford, PA 19468,  and | :<br>:<br>: |
| BEDROCK CARE, LLC<br>974 Route 45, Suite 1200<br>Pomona, NY 10970, | :<br>:<br>: |
| Defendants. | : |

## COMPLAINT

Plaintiff, Holly Segnere ("Segnere"), by and through her attorneys, hereby files this complaint against defendants, Parkhouse Nursing and Rehabilitation Center, L.P. ("Parkhouse Nursing"), Parkhouse Operating, LLC ("Parkhouse Operating"), and the Bedrock Care, LLC ("Bedrock").  Parkhouse Nursing, Parkhouse Operating and Bedrock are collectively referred to as "Parkhouse."  In support of her complaint, Segnere avers as follows:

### I. Preliminary Statement

1. This case involves discrimination and retaliation based on Segnere's disability and age.  Segnere had been employed 29 years with Parkhouse as a Nurse Aide.  Her work

- 1 -

performance in caring for Parkhouse's residents over the course of nearly three decades was exemplary.

2. At the outset of the COVID-19 pandemic, Segnere requested the issuance of an N-95 mask as an accommodation under the ADA because of lung disease resulting from 40 years of smoking. Parkhouse had provided N-95 mass to similarly situated employees who did not have a disability and/or were not regarded as having a disability. Parkhouse also provided such masks to similarly situated employees younger than Segnere. Parkhouse discriminated against Segnere by refusing to provide her with available N-95 masks and by refusing to engage in the interactive process required by the ADA after the request for an accommodation was made.

3. After Segnere complained about being treated disparately, Parkhouse mocked and ridiculed her. In one instance, a supervisor asked whether "Fietta [a resident who died from COVID-19] spit in your face?" When Segnere answered "No," the supervisor told her "Then a cloth mask is good enough for you." On another incident, Segnere was dared to quit her employment when a supervisor, in response to her complaint and request for an N-95 mask, said "What are you going to do? Can you live without working for six months?" Although the distress placed on Segnere in not having gainful employment was great, Parkhouse's discriminatory practices, and the resultant increased possibility of death or grievous bodily harm, caused her employment to terminate by way of constructively discharge on April 14, 2020.

## II. Parties

4. Segnere is an adult individual who is presently fifty-six years of age and resides at 1856 C. Farmington Avenue, Pottstown, Pennsylvania 19464.

5. Parkhouse Nursing is a limited partnership organized under the laws of the Commonwealth of Pennsylvania with a principal place of business at 1600 Black Rock Road, Royersford, Pennsylvania 19468.

6. Parkhouse Operating is a limited liability company organized under the laws of the Commonwealth of Pennsylvania with a principal place of business at 1600 Black Rock Road, Royersford, Pennsylvania 19468.

7. Bedrock is a business entity duly organized and existing under the laws of the State of New York, with its principal place of business is located at 974 Route 45, Suite 1200, Pomona, NY 10970. Bedrock is engaged in the ownership, operation and/or management of fourteen healthcare facilities in Pennsylvania, including Parkhouse Nursing, and provides healthcare, medical, therapy, rehabilitation and skilled nursing services to its residents.

8. Parkhouse engages in an industry affecting interstate commerce and, upon information and belief, employs more than five-hundred (500) employees.

### III. Jurisdiction & Venue

9. This action arises under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §12101, *et seq*. ("ADA"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. §621, *et seq*. ("ADEA"); and the Pennsylvania Human Relations Act, 43 P.S. §951, *et seq*. ("PHRA").

10. Jurisdiction over the federal claims for violation of the ADA and ADEA is invoked pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(4), and over the state law claim for violation of the PHRA pursuant to the doctrine of pendant jurisdiction.

11. Jurisdiction over the federal claims is appropriate because Segnere timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

12. More than one-hundred and eighty (180) days have elapsed since Segnere filed her charge of discrimination. On July 22, 2021, the EEOC mailed Segnere a Notice of Right to Sue Letter.

13. Jurisdiction over the state claim is appropriate because Segnere's charge of discrimination with the EEOC was cross-filed with the Pennsylvania Human Relations Commission.

14. This action properly lies in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391 because: (a) the events giving rise to Segnere's claims arose in this judicial district; and (b) Parkhouse regularly conducts business, and in fact employed Segnere, in this judicial district.

**IV.** **Facts**

15. Parkhouse provides rehabilitation and long-term nursing care at a 467-bed facility located at 1600 Black Rock Road, Royersford, Montgomery County, Pennsylvania ("Facility").

16. In October 1991, Segnere commenced employment with Parkhouse as a Nurse Aide. For nearly three decades, Segnere cared for the well-being of Parkhouse's residents and patients at the Facility.

17. In April 2020, the Facility housed residents who tested positive for COVID-19 on the seventh floor of the north section of the Facility, commonly referred to as N-7.

18. The remaining floors at the Facility were intended to house residents who were not inflicted by COVID-19. Segnere worked on certain of these floors and not N-7.

19. Parkhouse failed to establish and follow satisfactory protocols in connection with the movement of residents and staff between N-7 and other floors in the Facility.

20. Employees were not segregated after working on N-7 and freely intermingled with residents and staff on other floors at the Facility, thereby increasing the likelihood of spreading COVID-19.

21. On April 7, 2020, Segnere was in direct contact with at least one Parkhouse employee who worked on N-7 as well as other floors at the Facility. The employee soon thereafter communicated that she tested positive for COVID-19.

22. Also on April 7, 2020, Segnere was performing her employment duties when she came into direct contact with a resident who was diagnosed with COVID-19.

23. The inflicted resident was transported to N-7 without the appropriate care or safeguards to ensure that others were not placed in direct and unnecessary contact with her.

24. The resident inflicted with COVID-19 died within 48 hours of her diagnosis.

25. When leaving for the day on April 7, 2020, Segnere requested that she be provided with an N-95 mask to abate the risk of her contracting COVID-19.

26. At the time of Segnere's request, she suffered from lung disease as a result of nearly forty years of smoking, which was well known by Parkhouse.

27. Segnere's request was based on Parkhouse's failure to ensure a safe working environment for its employees consistent with guidelines provided by the Center for Disease Control and Prevention in connection with limiting the transmittal of COVID-19.

28. Other similarly situated employees, who did not suffer and/or were regarded as suffering from a disability, and who like Segnere were not working on N-7, had been provided with N-95 masks.

29. Other similarly situated employees, who were younger than Segnere, and who like Segnere were not working on N-7, had been provided with N-95 masks.

30. Segnere was told that she could request and receive an N-95 mask for her next scheduled shift, which was to occur the following week.

31. When Segnere returned to work the following week and requested an N-95 mask, Parkhouse denied her request without any further discussion.

32. Parkhouse's disparate treatment of Segnere was particular troublesome given that additional residents with whom Segnere provided care were diagnosed with COVID-19 and died.

33. Segnere received knowledge regarding one such resident during the week she was on leave.

34. Upon her return to work, Segnere again requested an N-95 mask and complained about the disparate treatment to which she was being subjected.

35. In response, Segnere was subjected to utterly appalling retaliation for complaining about and requesting personal protective equipment ("PPE").

36. Segnere was asked by a supervisor "Did Fietta [a resident who had died] spit in your face?"

37. When Segnere answered "No," to the question, she was told by the supervisor "Then a cloth mask is good enough for you."

38. Segnere was also told by a supervisor that an N-95 mask was purportedly unnecessary because "You don't have to bother with sick residents because they go to N-7 to die."

39. When Segnere further complained, she was practically dared to quit and told by a supervisor "What are you going to do? Can you live without working for six months?"

40. Parkhouse refused to accommodate Segnere by providing her with available PPE so she could perform her job.

41. Parkhouse also refused to engage in the interactive process with Segnere, as required by the ADA, after she requested the N-95 mask as an accommodation for her disability.

42. By not engaging in the interactive process, Parkhouse failed to perform its statutory obligation to determine whether Segnere's request for an N-95 mask was reasonable, and if not, whether alternative accommodations existed.

43. Although the distress placed on Segnere in not having gainful employment was great, the stress of being placed in an environment that eschewed federal and state safety guidelines, in which death or grievous bodily injury was a genuine possibility, was greater.

44. Segnere's concerns were well-founded given that the number of residents who died while in Parkhouse's care, which was one of the highest (if not the highest) in Pennsylvania.

45. The dangerous working condition to which Segnere was subjected, coupled with Parkhouse's discriminatory practices, forced Segnere to leave a job she loved.

46. Consequently, Parkhouse's actions caused Segnere to be constructively discharged from her employment on April 14, 2020.

47. Parkhouse's actions constitute unlawful discrimination and retaliation in violation of the ADA, ADEA and PHRA.

48. The intentional, outrageous, and egregious conduct of Parkhouse's actions justifies an award of punitive damages.

## V.     Causes of Action

### Count I:  Violation of the ADA, 42 U.S.C. §12101, *et seq*

49.     Segnere incorporates by reference the averments contained in Paragraphs 1 through 48, as if set forth fully herein.

50.     The ADA prohibits, *inter alia*, private employers from discriminating against an otherwise qualified individual with a disability, which includes termination of employment, advancement, compensation, as well as other privileges of employment.

51.     Under the ADA, an individual with a disability is a person who: (a) has a physical or mental impairment that substantially limits one or more major life activities; (b) has a record of such impairment; or (c) is regarded as having such an impairment.

52.     At all relevant times hereto, Segnere was a qualified individual with a disability as defined by the ADA.

53.     By the actions set forth in the preceding paragraphs of this complaint, Parkhouse unlawfully subjected Segnere to discrimination and retaliation based upon her disability and/or perceived disability in violation of the ADA.

54.     As a direct and proximate result of Parkhouse's violation of the ADA, Segnere has suffered, and continues to suffer, great harm in the form of lost back pay, lost front pay, other past and future pecuniary losses, emotional pain and suffering, inconvenience and loss of enjoyment of life.

### Count II:  Violation of the ADEA, 29 U.S.C. §621, *et seq*.

55.     Segnere incorporates by reference the averments contained in Paragraphs 1 through 54 as if set forth fully herein.

56. Under the ADEA, "it shall be unlawful for an employer-- (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or (3) to reduce the wage rate of any employee in order to comply with this chapter."

57. By the actions set forth in the preceding paragraphs of this complaint, Parkhouse unlawfully subjected Segnere to discrimination and retaliation based upon her age in violation of the ADEA.

58. As a direct and proximate result of Parkhouse's violation of the ADEA, Segnere has suffered, and continues to suffer, great harm in the form of lost back pay, lost front pay, other past and future pecuniary losses, emotional pain and suffering, inconvenience, and loss of enjoyment of life.

### Count III:  Violation of the PHRA, 43 P.S. §953, *et seq*.

59. Segnere incorporates by reference the averments contained in Paragraphs 1 through 58 as if set forth fully herein.

60. It is an unlawful discriminatory practice under the PHRA for "any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability . . . to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms,

conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required."

61. By the actions set forth in the preceding paragraphs of this complaint, Parkhouse unlawfully subjected Segnere to discrimination and retaliation based upon her disability, perceived disability and/or age in violation of the PHRA.

62. As a direct and proximate result of Parkhouse's violation of the PHRA, Segnere has suffered, and continues to suffer, great harm in the form of lost back pay, lost front pay, other past and future pecuniary losses, emotional pain and suffering, inconvenience, and loss of enjoyment of life.

## VI. Jury Demand

Segnere demands trial by jury on all claims and issues triable by a jury.

## VII. Prayer for Relief

WHEREFORE, Segnere respectfully requests that this Honorable Court:

(a) declare Parkhouse's conduct to be in violation of Segnere's rights afforded under the ADA, ADEA, and PHRA;

(b) enjoin Parkhouse from engaging in such conduct in the future;

(c) award Segnere all compensatory damages to which she is entitled, including back pay, front pay, other past and future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life, liquidated damages, and other statutory and compensatory damages;

(d) award Segnere punitive damages to which she proves entitled;

(e) award Segnere her attorneys' fees and costs; and

(f) grant such other relief as it may deem just and proper.

                                      Respectfully submitted,

                                      UNRUH, TURNER, BURKE & FREES

Dated: October 18, 2021          By: *s/ Brian D. Boreman*
                                      Brian D. Boreman
                                      Attorney I.D. No. 84074
                                      Bboreman@utbf.com
                                      17 W. Gay Street
                                      West Chester, PA 19382
                                      610-692-1371
                                      Attorneys for Plaintiff